

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00084-CV

**IN THE INTEREST OF D.D.D.**, a Child

From the 166th Judicial District Court, Bexar County, Texas
Trial Court No. 2022PA01953
Honorable Kimberly Burley, Judge Presiding

Opinion by:      Beth Watkins, Justice

Sitting:         Patricia O. Alvarez, Justice
                 Luz Elena D. Chapa, Justice
                 Beth Watkins, Justice

Delivered and Filed: June 20, 2024

AFFIRMED

Appellant A.D. appeals the trial court's order terminating her parental rights to her child,

D.D.D. (born 2022).[1] A.D. argues the evidence is legally and factually insufficient to support the

trial court's finding that termination is in the child's best interest. We affirm the trial court's order.

### BACKGROUND

On December 9, 2022, the Texas Department of Family and Protective Services removed

D.D.D. from the hospital where she was born because she was born addicted to methamphetamine.

At the time of her removal, D.D.D. had been in the neonatal intensive care unit "experiencing

withdrawal symptoms . . . for a couple of months." The Department obtained temporary managing

---

[1] To protect the privacy of the minor child, we use initials to refer to the child, her biological parents, and her caregiver. TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

conservatorship over D.D.D., placed her with her paternal grandparents, and filed a petition to terminate the parental rights of both A.D. and D.D.D.'s father, D.D. The Department also created a family service plan requiring A.D. to, inter alia, successfully complete a parenting course and "demonstrate parenting" in all of her interactions with D.D.D., avoid all criminal activity, comply with random drug tests, and "be negative on all tests to demonstrate that she can live a drug/alcohol free lifestyle" as a condition of reunification. The Department ultimately pursued termination of A.D.'s and D.D.'s parental rights.

On December 8, 2023, twelve months after removal, the trial court held a one-day bench trial at which A.D. appeared. The trial court heard testimony from four witnesses: (1) the Department's caseworker, Jennifer Henry; (2) D.D.; (3) D.D.D.'s paternal grandmother and current placement, L.V.; and (4) A.D. The trial court also admitted A.D.'s service plan into evidence. On February 2, 2024, the court signed an order terminating A.D.'s parental rights pursuant to Texas Family Code section 161.001(b)(1)(O), (P), and (R) and its finding that termination of A.D.'s parental rights was in D.D.D.'s best interest.[2] A.D. appealed.

**ANALYSIS**

A.D. challenges only the legal and factual sufficiency of the evidence on which the trial court relied to conclude that termination was in the best interest of D.D.D. She does not challenge the sufficiency of the evidence to support the trial court's predicate findings under section 161.001(b)(1)(O), (P), and (R). *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(O) (parent failed to comply with court-ordered service plan), 161.001(b)(1)(P) (parent used controlled substance in manner that endangered child's health or safety and parent either failed to complete court-ordered substance abuse treatment or continued to abuse controlled substance after completing treatment),

---

[2] The trial court also terminated D.D.'s parental rights. He is not a party to this appeal.

161.001(b)(1)(R) (parent was cause of child being born addicted to alcohol or controlled substance). Accordingly, we must accept those unchallenged findings as true. *See In re S.J.R.-Z.*, 537 S.W.3d 677, 682 (Tex. App.—San Antonio 2017, pet. denied).

### *Standard of Review*

The involuntary termination of a natural parent's rights implicates fundamental constitutional rights and "divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent." *Id.* at 683 (internal quotation marks omitted). "As a result, appellate courts must strictly scrutinize involuntary termination proceedings in favor of the parent." *Id.* The Department had the burden to prove, by clear and convincing evidence, both that a statutory ground existed to terminate A.D.'s parental rights and that termination was in the best interest of D.D.D. TEX. FAM. CODE ANN. § 161.206; *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re S.J.R.-Z.*, 537 S.W.3d at 683.

When reviewing the sufficiency of the evidence supporting a trial court's order of termination, we apply well-established standards of review. *See In re J.F.C.*, 96 S.W.3d 256, 263–64 (Tex. 2002). In reviewing the legal sufficiency of the evidence to support the trial court's findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id.* at 345. A factual sufficiency review requires us to consider the entire record to determine whether the evidence that is contrary to a finding would prevent a reasonable factfinder from forming a firm belief or conviction that the

finding is true. *See id.* The factfinder is the sole judge of the weight and credibility of the evidence. *Id.* at 346. This is because "the trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

### *Best Interest*

#### *Applicable Law*

There is a strong presumption that a child's best interest is served by maintaining the relationship between a child and the natural parent, and the Department has the burden to rebut that presumption by clear and convincing evidence. *See, e.g.*, *In re R.S.-T.*, 522 S.W.3d 92, 97 (Tex. App.—San Antonio 2017, no pet.). To determine whether the Department satisfied this burden, the Texas Legislature has provided several factors[3] for courts to consider regarding a parent's willingness and ability to provide a child with a safe environment, and the Texas Supreme Court has used a similar list of factors[4] to determine a child's best interest. TEX. FAM. CODE ANN.

---

[3] These factors include, inter alia: "(1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills [. . .]; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child." TEX. FAM. CODE § 263.307(b).

[4] Those factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

§ 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). In analyzing these factors, the court focuses on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regul. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

A best interest finding, however, does not require proof of any particular factors. *See In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at *5 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.). Neither the statutory factors nor the *Holley* factors are exhaustive, and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.). Additionally, evidence that proves a statutory ground for termination is probative on the issue of best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). Furthermore, in determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may judge a parent's future conduct by her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Finally, we presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a).

*Application*

Henry testified that the most important part of A.D.'s service plan was the requirement that she complete substance abuse treatment. A.D.'s service plan also required her to test negative on all random drug tests. Illegal drug use is relevant to multiple best interest considerations, both statutory and *Holley* factors, including a child's emotional and physical needs now and in the future, a parent's parental abilities, stability of the home, and a parent's acts or omissions pertinent to determining whether the parent-child relationship is improper. *See Holley*, 544 S.W.2d at 371–72; *see also* TEX. FAM. CODE § 263.307(b)(8) (trial court may consider parent's history of substance abuse in best-interest determination). "A parent's illegal drug use supports a finding that

termination of the parent-child relationship is in the best interest of the child." *In re A.M.O.*, No. 04-17-00798-CV, 2018 WL 2222207, at *2 (Tex. App.—San Antonio, May 16, 2018, no pet.) (mem. op). "The factfinder can give 'great weight' to the 'significant factor' of drug-related conduct." *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). This is because "drug use can destabilize the home and expose children to physical and emotional harm if not resolved." *In re A.L.S.*, 660 S.W.3d 257, 275–76 (Tex. App.—San Antonio 2022, pet denied).

It is undisputed that A.D. used methamphetamine during her pregnancy and that the Department removed D.D.D. because she was born addicted to methamphetamine, and those facts supported one of the trial court's predicate termination findings. *See* TEX. FAM. CODE § 161.001(b)(1)(R). While the evidence supporting that finding is not dispositive of D.D.D.'s best interest, it is probative on that question. *In re C.H.*, 89 S.W.3d at 28. Additionally, Henry, D.D., and L.V.[5] all testified that A.D. had a long history of substance abuse, and A.D. testified that she was on probation for a previous drug conviction. *See In re E.D.*, 419 S.W.3d at 620.

The evidence showed A.D. completed an inpatient substance abuse program four months before trial and completed an after-care program approximately two months before trial. A.D. testified that she last used methamphetamine three months before trial, and she denied using drugs more recently. Henry testified, however, that she did not believe A.D. had achieved sobriety. *See* TEX. FAM. CODE § 263.307(b)(8). She explained that A.D. refused to submit to drug tests twice during this case, and on a third occasion she "refused the hair follicle, and she only did the [urinalysis]." Like illegal drug use, failure to submit to drug testing—through which the trial court could infer continued drug abuse—is relevant to multiple best-interest considerations. *In re A.M.L.*,

---

[5] L.V. testified that she and D.D. had known A.D. since 1995.

No. 04-19-00422-CV, 2019 WL 6719028, at \*4 (Tex. App.—San Antonio Dec. 11, 2019, pet. denied) (mem. op); *see In re R.S.*, No. 01-20-00126-CV, 2020 WL 4289978, at \*7 (Tex. App.—Houston [1st Dist.] July 28, 2020, no pet.) (mem. op.) ("The trial court could have reasonably inferred that the father was still using methamphetamine, or some other illegal drug, based on his failure to take court-ordered drug tests."); *In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (concluding factfinder could reasonably infer parent's failure to submit to court-ordered testing indicated parent avoided testing in an effort to conceal continued drug use). Based on Henry's testimony that A.D. refused three drug tests, the trial court could have reasonably found that A.D. was still using illegal drugs and that she had not shown a willingness to cooperate with the Department. *See* TEX. FAM. CODE § 263.307(b)(8), (10).

Henry also testified that the Department had not been able to increase A.D.'s visits with D.D.D. because A.D.'s drug tests "[kept] coming back positive." *See* TEX. FAM. CODE § 263.307(b)(8). She testified that while A.D.'s recent urinalysis tests had been negative, A.D. never tested negative on a hair follicle test during the year this case was open. She further testified that the drug levels in A.D.'s hair follicle tests more than doubled between September 22, 2023 and November 17, 2023,[6] and she explained this result was consistent with regular methamphetamine use. *See id.* Henry testified that A.D. "deflects and she minimizes her substance abuse. . . . [S]he either says that she hasn't used and [*sic*] she appears confused as to why the test results are still testing positive." *See In re J.A.R.R.*, No. 04-22-00184-CV, 2022 WL 4362464, at \*9 (Tex. App.—San Antonio Sept. 21, 2022, no pet.) (mem. op.) (considering evidence that parent "did not take responsibility for the conditions that led to the children's removal"). Based on this evidence, the trial court could have reasonably credited Henry's testimony that A.D.'s substance

---

[6] The November 2023 hair follicle test occurred approximately three weeks before trial.

abuse was "still a problem to this day" and "nothing has changed from the time that the Department removed" D.D.D. *See In re R.L.M.*, No. 04-18-00136-CV, 2018 WL 2943651, at *3 (Tex. App.—San Antonio June 13, 2018, pet. denied) (mem. op.); *see also* TEX. FAM. CODE § 263.307(b)(11) (trial court may consider parent's willingness to effect positive changes in a reasonable time).

The evidence showed that A.D. completed the parenting class required by her service plan. Henry testified, however, that the Department had "concerns that she [was] not demonstrating parenting" skills. *See* TEX. FAM. CODE § 263.307(b)(12). The evidence showed D.D.D., who was born nine weeks prematurely, had special needs due to her prenatal methamphetamine exposure. *See* TEX. FAM. CODE § 263.307(b)(1) (trial court may consider child's age and physical and mental vulnerabilities); *Holley*, 544 S.W.2d at 371–72 (trial court may consider child's emotional and physical needs). At the time of trial, D.D.D. was attending physical therapy, "need[ed] to be seen by a developmental specialist," and was "being monitored closely" for neurological issues, including "possible silent seizures." Both Henry and L.V. testified these medical appointments were important to D.D.D.'s development and well-being, and Henry testified that she believed D.D.D. would be harmed if she did not receive this care. Henry testified that A.D., in contrast, "minimize[d]" D.D.D.'s medical needs "or she will blame-shift to the caregivers." *See In re J.N.P.*, No. 09-20-00245-CV, 2021 WL 922338, at *4, *10 (Tex. App.—Beaumont Mar. 11, 2021, no pet.) (mem. op.) (considering parent's minimization of and lack of understanding of child's medical needs in best interest analysis). She explained that when she and A.D. discussed D.D.D.'s neurological delays, A.D. "just says that when she sees [D.D.D.] she thinks she's fine, so she doesn't understand why she would need" the medical appointments and therapies the child had been attending. Based on this evidence, the trial court could have reasonably credited Henry's testimony that she did not believe A.D. had the necessary parenting skills to address D.D.D.'s needs. *See* TEX. FAM. CODE § 263.307(b)(12)(B), (F) (trial court may consider whether parent

demonstrates "understanding of the child's needs" and ability to provide child with "care [and] nurturance . . . consistent with the child's physical and psychological development").

A.D.'s service plan also required her to avoid criminal activity. Nevertheless, she testified that she was issued a citation for shoplifting in October of 2023, approximately two months before trial. A.D. further testified that at the time of trial, she had an upcoming January 2024 hearing for an unspecified criminal charge. And, as noted above, A.D. admitted that she used methamphetamine three months before trial. The trial court could have reasonably found that A.D.'s "inability to maintain a lifestyle free of criminal conduct" would subject D.D.D. to instability and endanger her well-being. *See In re X.J.L.*, No. 04-17-00466-CV, 2017 WL 4655102, at *3 (Tex. App.—San Antonio Oct. 18, 2017, no pet.) (mem. op.); *see also Holley*, 544 S.W.2d at 371–72 (trial court may consider stability of proposed placement).

D.D.D., who was fourteen months old at the time of trial, had been living with her paternal grandparents—L.V. and L.V.'s husband—since she was released from the hospital two months after her birth. Henry confirmed that L.V.'s home was the only home D.D.D. had ever lived in. *See In re E.D.*, 682 S.W.3d 595, 611 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) ("As the best-interest inquiry is child-centered, we cannot discount or minimize the level of permanence the child has with his foster parents."). L.V. testified that she and her husband were willing to be a permanent placement for D.D.D. and wanted to adopt her. *See* Tex. Fam. Code § 263.307(a). She also testified that they had previously adopted D.D.'s older child, D.D.D.'s half-brother. *See In re D.J.R.*, No. 04-22-00579-CV, 2023 WL 3214552, at *5 (Tex. App.—San Antonio May 3, 2023, pet. denied) (mem. op.) ("[K]eeping siblings together is a factor a trial court may consider when deciding the best interest of the child.") (internal quotation marks omitted). Henry testified that D.D.D. was bonded to her caregivers and her half-brother and was "really well taken care of where she's at."

Henry further testified that L.V. and L.V.'s husband were "very consistent with making sure [D.D.D. was] taken care of and very proactive in making sure that she's being monitored for any other concerns that may be coming up." She added that they had shown a willingness to maintain "strong boundaries with their son," D.D., to protect D.D.D. L.V. testified that if she adopted D.D.D., she might be willing to allow A.D. and D.D. to be part of the child's life at some point, but she testified "they are not ready, yet, to be where they should be for [D.D.D.]," and she agreed that stability for D.D.D. was more important than any concerns she may have for A.D. and D.D.

A.D. told the trial court that she "would like to see [L.V.] have managing conservatorship" with A.D. "having limited rights and the ability to see" D.D.D. She testified that she loved D.D.D. very much, and she described the child as "the highlight of [her] life" and "an absolute delight." While Henry testified that A.D. had been late to some visits and had missed others due to her inpatient drug treatment, she also testified that A.D. had been visiting D.D.D. weekly since she was released from drug treatment, that those visits typically went well, and that she had no concerns about A.D.'s behavior during the visits. Additionally, A.D. testified that she was employed, had completed several requirements of her service plan, and had started attending weekly therapy. She also described her current home and relationship as safe and stable. Finally, she explained that she wanted D.D.D. to have an opportunity to meet her maternal relatives, including A.D.'s mother and older children, who were 20 and 23 at the time of trial. A.D. acknowledged that she had "not been doing everything that [she] need[ed] to," but she testified she was "willing to do anything" to maintain her connection with D.D.D. The trial court was not required to credit this evidence over the other conflicting evidence it heard. *See, e.g.*, *In re A.N.C.*, No. 04-22-00680-CV, 2023 WL 2297407, at *4 (Tex. App.—San Antonio Mar. 1, 2023, no pet.) (mem. op.).

After reviewing the evidence under the appropriate standards of review, we conclude a reasonable factfinder could have formed a firm belief or conviction that termination of A.D.'s parental rights was in D.D.D.'s best interest. *In re J.F.C.*, 96 S.W.3d at 266. We therefore hold legally and factually sufficient evidence supports the trial court's best interest finding, and we overrule A.D.'s arguments to the contrary.

## CONCLUSION

We affirm the trial court's order of termination.

Beth Watkins, Justice